UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| Annemarie Chisholm,<br>    *Plaintiff*,<br><br>    *v.*<br><br>Donald Ramia and the Shelton Board of Education,<br>    *Defendants.* | Civil No. 3:07cv1691 (JBA)<br><br><br><br>July 1, 2009 |
|---|---|

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [Doc. # 22]

Plaintiff Annemarie Chisholm brings suit under the Fourteenth Amendment against Defendants Shelton Board of Education ("Board") and Donald Ramia, formerly the headmaster of Shelton High School ("School"), for their decision not to retain her as the head of the Technology and Business Departments at the School ("Department Head"). The Board and Ramia moved for summary judgment, in opposition to which Plaintiff clarified that her suit, although one count, alleges three distinct Fourteenth Amendment Claims: (1) a class-of-one Equal Protection Clause claim;[1] (2) deprivation of her property interest in the Department Head position; and (3) deprivation of her liberty or property interest under a "stigma-plus" theory, by means of a memorandum by Ramia explaining his decision not to retain her. For the reasons stated below Defendants' motion will be granted.

---

[1] Plaintiff has abandoned her class-of-one claim under the Equal Protection Clause in light of *Engquist v. Oregon Department of Agriculture*, which held that "the class-of-one theory of equal protection has no application in the public employment context." 128 S. Ct. 2146, 2156 (2008).

I.      Factual Background

The record—which contains Plaintiff's deposition, two affidavits (of Ramia and Shelton Schools Superintendent Robin Willink), an Evaluation and Memorandum of Plaintiff written by Ramia, previous evaluations of Plaintiff by Ramia, and minutes of the Board's meetings—reveals the following:

The Board hired Chisholm as a full-time teacher in 1996. (Chisholm Dep. at 15:24–16:3.) In 2003, while Chisholm was serving as a business teacher at the School, she expressed interest to the Board in the newly open Department Head position. (*Id.* 16:15–23, 18:23–19:1.) Ramia, the School's headmaster, recommended her as the next Department Head to the Board, which then selected her for the position in February 2004. Ramia recommended her for reappointment, and the Board reappointed her, as Department Head for three academic years, serving through Spring 2007.

In February 2007 Ramia completed the form labeled "Recommendation for Reappointment to the Stipend Position for the 2007–08 School Year," stating that he did not recommend her for rehire. (Evaluation & Memorandum, Ex. 3 to Ramia Aff., Ex. C to Defs.' Mem. Supp.) The Director of Human Resources suggested that he should "give . . . Chisholm an explanation as to [his] decision" (Ramia Aff. at ¶ 20), so he attached a memorandum to the evaluation in which he wrote, among other things, that "[i]t has, unfortunately, been my observation that both of the departments under your supervision have seen a tremendous decline in morality [*sic*]" (Evaluation & Memorandum at 3).

2

Both Ramia and Chisholm reference a public confrontation between them in December 2006 in the School's hallway. According to Chisholm, at a School meeting Ramia had silently authorized a technology teacher—rather than Chisholm, the Department Head—to make a presentation for the Technology Department, shocking the meeting's attendees. When Plaintiff asked Ramia about it after the meeting, Ramia "sa[id] 'I have a big problem with you'" and "sa[id] 'Why don't you just resign, resign, resign and get out.' He screamed this at the top of his lungs. And there were many people who heard, colleagues, students, construction workers." (Chisholm Dep. at 55:16–21, 61:12–15.) According to Ramia, by contrast, Plaintiff displayed a "confrontational attitude" in the hallway when Ramia "questioned [her] about a budget presentation to the Department Chairs." (Evaluation & Memorandum at 2.) The record is silent as to any events transpiring between this event and February 2007, when Ramia decided against retaining Plaintiff as Department Head.

Plaintiff's undisputed testimony is that the Evaluation and Memorandum was left in her pigeonhole mailbox to which students and other teachers had access, and that she did not receive it until March 30, 2007, six weeks after its stated date (February 15, 2007). However, Chisholm could not say that anyone else had, in fact, seen the Evaluation and Memorandum.

The parties dispute whether Ramia or the Board effectuated Plaintiff's non-retention. Plaintiff argues that because she became the Department Head only after the Board accepted

Ramia's recommendation and formally appointed her, that she could not have lost that position without a decision by the Board. Defendants argue that Ramia had and exercised the authority to not retain Plaintiff, and that his decision was final without Board approval. Plaintiff's position is belied by the evidence.

Plaintiff proffers agendas from five monthly Board meetings held between April and August 2007—which each list as an "item[] to be voted on" the "[c]onsideration of the Board to approve the reappointment of the stipend position holders . . . each [of whom] has been recommended for reappointment" (Minutes [Docs. ## 26-3 to 26-7])—and her observation that the Board approved her elevation and her retention each year (Chisholm Dep. at 39:5–8). In her deposition Chisholm acknowledged that she does not know whether the Board "took any action concerning" Ramia's determination of non-retention, or "what the [B]oard itself did" on the matter. (*Id.* 78:18–79:6.) The fact of the Board's participation in hiring and retaining her each year, however, does not demonstrate that it took, or was required to take, any affirmative steps *not* to retain her.

Moreover, uncontested evidence supports Defendants' position that the Superintendent and the administrator's evaluator each independently have the authority to decide not to retain a department administrator. Shelton Schools Superintendent Robin Willink avers that "[n]o other action" aside from the evaluator's determination of non-retention "is required to remove a . . . Department Head." (Willink Aff., Ex. B to Defs.' Mem. Supp., at ¶ 18; *accord* Ramia Aff. at ¶ 13). The Board's agendas from April through

4

August 2007 are silent both as to any consideration of Chisholm and as to any vote by the Board to adopt any evaluator's recommendation of *non*-retention of any department administrator, reflecting only the Board's consideration of candidates who had "been recommended for reappointment," which Plaintiff undisputedly was not. Further, Willink averred that the Board never met to consider whether to retain Chisholm as Department Head after Ramia determined not to do so. (Willink Aff. at ¶ 19.) On the record evidence the only inferrable possibility is that Ramia, alone, determined not to retain Chisholm as Department Head.

II.     Discussion

    A.     Deprivation of a Property Interest

In this circuit, while "the Fourteenth Amendment protects a property interest in a particular position or rank," *Ciambriello v. County of Nassau*, 292 F.3d 307, 318 (2d Cir. 2002), more than mere employment is required for its protections to attach to a particular employee. "An abstract need, desire or unilateral expectation [of continued employment] is not enough" to create "an interest protectable under the Constitution." *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002). Instead,

> a protectable property interest may arise in a situation where an employee may be removed only for cause. Indeed, in this circuit, a person may possess a protected interest in public employment if contractual or statutory provisions guarantee continued employment absent 'sufficient cause' for discharge or he can prove a de facto system of tenure.

*Id.* (citations omitted).

5

Plaintiff has produced no evidence on which to conclude that she had a protectable property interest in her position as Department Head. Regardless of whether Ramia could unilaterally decide not to retain her or whether his recommendation of non-retention needed approval from the Board, there is no evidence that Defendants needed to demonstrate good cause to strip her of the title. Plaintiff had no contract with either Mr. Ramia or the Board governing her Department Head position or guaranteeing her continued employment in that position. Indeed, Chisholm agreed that her status as Department Head fell entirely outside the statutory scheme of tenure for public school teachers embodied in Conn. Gen. Stat. § 10-151(d).[2] (Chisholm Dep. at 25:16–26:5.) She testified that "each year [she] had to submit a long form [to re-apply] for department chair," that each year Ramia made decisions regarding department chairs at different times during the academic year, that she did not know whether she would return as Department Head until she received an evaluation from Ramia recommending retention of her, and that she did not sign any contracts governing her role as Department Head. (*Id.* 28:1–30:12.) And while Plaintiff thought that she would have the opportunity to defend herself against what she believed to be a mere recommendation by Ramia not to retain her (*id.* 37:4–15), she does not assert that she thought the Board needed cause to decide not to retain her.

Plaintiff's argument that she had a property interest because "the evidence before the [C]ourt would permit a jury to find that [Mr.] Ramia himself had no power to appoint or

---

[2] This statute provides Chisholm, and all public school teachers in Connecticut tenured under its provisions, a property interest in their positions as teachers. *See, e.g.*, *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005) (citing § 10-151(d) and holding that "[a] tenured public-school teacher[] has a legitimate claim of entitlement to his position under Connecticut law").

remove the plaintiff and that the Board of Education itself was required to schedule the matter on its agenda and vote before her circumstances could be changed," demonstrating that "[P]laintiff [had] more than a 'mere unilateral expectancy'" in being Department Head (Pl.'s Opp'n at 8), is not supported by her proffer of the previously discussed agendas from Board meetings or her observation that the Board approved her elevation and her retention each year. (Chisholm Dep. at 39:5–8; *see also id.* 32:6–21.) As discussed above, this evidence does not support an inference that the Board needed to approve Mr. Ramia's recommendation of non-retention, and Chisholm acknowledged that she does not know whether the Board "took any action concerning" Ramia's determination of non-retention, or "what the [B]oard itself did" on the matter. (*Id.* 78:18–79:6.)

In any event Plaintiff's argument puts the cart before the horse: regardless of the process by which an employer terminates an employee, the employee does not enjoy a Fourteenth Amendment procedural due process protection unless she has a property interest in the job—that is, unless she is entitled to the employment in the first place. *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (Due Process Clause "requires 'some kind of a hearing' prior to the discharge of an employee *who has a constitutionally protected property interest in his employment*") (emphasis added). Because Chisholm had no entitlement to continued employment as the Department Head, her property-interest-based Due Process Clause claim must fail.

7

B.     Deprivation of a Liberty Interest (Stigma-Plus)

Plaintiff's stigma-plus claim may be premised either on an asserted property or liberty interest. At oral argument Plaintiff seemed to agree that her stigma-plus claim relied for its "plus" on the property interest asserted in her procedural due process claim. Because the Court has concluded that she had no property interest in her position as Department Head, her stigma-plus claim must also fail. Nonetheless, because of lack of clarity from oral argument about whether Plaintiff was also asserting an alternate theory of the "plus" underpinning her stigma-plus claim, the Court will address the alternate liberty-interest theory. It concludes that even if Plaintiff could establish that Ramia's memorandum contained stigmatizing statements and was made public, Ramia would be entitled to qualified immunity because the law was—and is—unclear as to whether his actions were sufficiently "adverse" to give rise to a stigma-plus claim.

1.     Legal Principles of the Stigma-Plus Claim

The "stigma-plus" theory claim derives from the Supreme Court's 1976 decision in *Paul v. Davis*, which held that defamation resulting in harm to a person's reputation, standing alone, does not violate the Fourteenth Amendment's Due Process Clause because it does not "result in a deprivation of any 'liberty' or 'property' recognized by state or federal law" and does not "work[] any change in [her] status as theretofore recognized under the State's laws." 424 U.S. 693, 712 (1976). Instead, the Court held, state action harming a plaintiff's reputational interest attains constitutional valence when it results in "a right or status previously recognized by state law [being] distinctly altered or extinguished." *Id.* 711. Thus, "*Paul* has been widely interpreted as holding that 'stigma plus' is required to establish

a constitutional deprivation, but it is not entirely clear what the 'plus' is." *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989).

Under "the still-evolving legal theory of stigma-plus," *Patterson v. City of Utica*, 370 F.3d 322, 328, 330 (2d Cir. 2004), "a plaintiff [must] allege (1) the utterance of a statement about her that is injurious to her reputation, 'that is capable of being proved false, and that he or she claims is false,' and (2) 'some tangible and material state-imposed burden . . . in addition to the stigmatizing statement,'" *Velez v. Levy*, 401 F.3d 75, 87 (2d Cir. 2005) (citations omitted). More specifically, "[t]he defamatory statement must be sufficiently public to create or threaten a stigma," and "because '[a] free-standing defamatory statement . . . is not a constitutional deprivation,' but is instead 'properly viewed as a state tort of defamation,' the 'plus' imposed by the defendant must be a specific and adverse action clearly restricting the plaintiff's liberty—for example, the loss of employment." *Id.* 87–88. The defamatory statement must have been made concurrently with the adverse action; "to meet a 'stigma-plus' standard" a plaintiff must show "that the defamation . . . was coupled with a deprivation of a legal right or status." *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002).

        2.        "Plus:" Adverse Action Clearly Restricting Plaintiff's Liberty

The Second Circuit has not clearly decided whether demotion, rather than dismissal from employment or termination of a legal right or status, is "a specific and adverse action clearly restricting the plaintiff's liberty"—that is, whether demotion can constitute the "plus" necessary for a "stigma-plus" claim. In *Baden v. Koch*, the former Chief Medical Examiner sued the Mayor of New York on a stigma-plus theory when the mayor demoted Baden to Deputy Chief Medical Examiner and publicized the bases on which he decided to demote

9

Baden. The Second Circuit concluded that Baden had merely been demoted, that he had been foreclosed "only from holding the [Chief Medical Examiner] position in New York City at this time," and thus that his liberty interest was far less compelling than a person whose employment had been terminated. The court stated that in this circumstance "Baden has asserted *at best* a weak liberty interest under the Fourteenth Amendment." 799 F.2d 825, 831 (emphasis added). The court made clear that this statement was *dicta*, however, by holding that even assuming *arguendo* that a liberty interest attached to his demotion, "Baden received all the process that was due him." *Id.* 831; *see also id.* 833.

In later decisions the Second Circuit has clarified that *Baden* did not settle the question of whether an employment decision lesser than termination is sufficient to support a stigma-plus claim. In *Neu v. Corcoran*, the former president of an automobile insurance company brought suit against state officials for making defamatory statements about him that ruined his reputation and "forced [him] out of the automobile repair business, which was his sole livelihood." 869 F.2d at 664. The court held that the officials were entitled to qualified immunity because it was unclear from precedent whether the harm alleged by the plaintiff was the kind of "plus" envisioned in *Paul. Id.* The court explained:

> On the one hand, . . . *Paul* might plausibly be interpreted as holding that any governmental defamation that causes a person to lose his job and impairs his ability to pursue his chosen profession or occupation is enough to constitute a deprivation of liberty, even if it does not occur in the course of dismissal from government employment or alteration of some other right or status recognized by state law. . . . On the other hand, . . . *Paul* thus strongly suggests that defamation even if it leads to a significant loss of employment opportunities, is not a deprivation of a liberty interest unless it occurs in the course of dismissal or refusal to rehire the individual as a government employee or during the termination or alteration of some other legal right or status. . . . [W]e do not think our cases have clarified this ambiguity left by

10

>*Paul* nor have they clearly established that defamation occurring other than in the course of dismissal from a government job or termination of some other legal right o[r] status will suffice to constitute a deprivation of a liberty interest.

*Id.* 667 (paragraphs omitted).

Other recent Second Circuit cases also leave this issue unsettled. *Patterson* cites *Baden* for the proposition that, assuming some process was due, calculation of the plaintiff's liberty interest involves determination of "whether plaintiff was terminated as opposed to demoted[, which] [a]ffects the strength of his private interest, with termination obviously increasing its strength." *Patterson*, 370 F.3d at 337. In *Morris v. Lindau* the court expressly declined to "explore this issue" because "the evidence [the plaintiff] offers on the subject of his alleged demotion only supports an inference of a *de minimis* change in responsibility, [and thus] he has suffered no 'deprivation of [a] legal right or status.'" 196 F.3d 102, 114 (2d. Cir. 1999). In *Donato*, which concerned a employee who "was not simply demoted—she was fired by her employer of 28 years," the court explained that in *Baden* the court "held that [Baden's] demotion *may have* implicated a 'weak liberty interest.'" *Donato*, 96 F.3d at 631 (quoting *Baden*, 799 F.2d at 831) (emphasis added).

Nor have district courts within this Circuit come to any consensus on the status of demotion in a stigma-plus analysis. The Court's research reveals no cases in which a district court addressed squarely a stigma-plus claim in the context of a demotion. Four district court cases citing *Baden* address claims by plaintiffs who were neither demoted nor dismissed, and they are thus inapposite. *See Schlesinger v. New York City Transit Auth.*, No. 00 civ. 4759, 2001 WL 62868, *7, 2001 U.S. Dist. LEXIS 632, *23–*24 (S.D.N.Y. Jan. 24, 2001); *Gordon v. Nicoletti*, 84 F. Supp. 2d 304, 312 (D. Conn. 2000); *Kane v. Krebser*, 44

11

F. Supp. 2d 542, 548–49 (S.D.N.Y. 1999); *Dower v. Dickinson*, 700 F. Supp. 640, 647 (N.D.N.Y. 1988). One district court, addressing a claim by a real estate developer complaining of stigmatizing comments that harmed his ability to make deals in the future—not a demotion—interpreted *Baden* to support "the more restrictive view of the 'stigma plus' test" because, "[a]pparently, a potential loss of opportunity at future employment and a demotion in rank and pay were not considered to be a 'tangible injury' by the Second Circuit." *Dower*, 700 F. Supp. at 647.

Moreover, it is unclear whether the non-retention of Chisholm even constitutes a "demotion." Plaintiff argues that her non-retention is "very much like" that experienced by the plaintiff in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).[3] (Pl.'s Opp'n at 7.) Plaintiff's non-retention, however, is entirely unlike Roth's non-rehire in that after Ramia's decision she retained her tenured position as a teacher, while Roth was left unemployed by the university's decision, a difference central to a determination of whether any process is due. Before, during, and after Chisholm's term as Department Head, she was a tenured teacher, and Ramia's Evaluation and Memorandum makes clear that his evaluation

---

[3] In *Roth* the Supreme Court held that a non-tenured professor hired on probation did not have a property interest in his position as a professor at a state college where "the terms of [his] appointment secured absolutely no interest in re-employment for the next year" and "supported absolutely no possible claim of entitlement to re-employment," and where there was no "state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it." 408 U.S. at 578. It held that "[i]t stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Id.* 575. Finally, the Court suggested that had the university's decision not to re-hire Roth been accompanied by a "charge against him that might seriously damage his standing and associations in his community, . . . due process would accord an opportunity to refute the charge before University officials." *Id.* 573. In *Paul* the Court repeated this suggestion, though it stopped short of endorsing it. *Paul*, 424 U.S. at 709–10; *see also Neu*, 869 F.2d at 667.

of her extends only to her work as a Department Head. Even though Chisholm received a stipend for her work as Department Head,[4] her service in that position never affected her title or tenure as a teacher. Unlike a change in job status and title from chief medical examiner to deputy chief medical examiner, Chisholm only experienced the loss of a position ancillary and in addition to her otherwise unchanged job position, duties, and protections. As the Second Circuit observed in *Baden*, Supreme Court precedent stands for the proposition that "no name-clearing hearing [is] required . . . when [a] state employer defames [an] employee 'who continues to be an employee.'" *Baden*, 799 F.2d at 830 (describing and quoting *Paul*, 424 U.S. at 710 (describing *Roth*, 408 U.S. at 573)).

In addition, *Paul* makes clear that the "right or status" lost by a stigma-plus plaintiff must have been "previously recognized by state law," *Paul*, 424 U.S. at 711, so a major part of the calculus in determining whether a plaintiff has a liberty interest for purposes of a stigma-plus claim is the statutory recognition and regulation of the position lost. In contrast to the situation in *Baden*, where New York State law recognizes and governs the appointment and operation of the position of New York City Chief Medical Examiner, *see Baden*, 799 F.2d at 829, the record here bears no indication that Connecticut law in any way addresses, governs, or recognizes the department administrator positions at Shelton. Therefore, even if Chisholm's non-retention were deemed a "demotion," it would be materially unlike the sort of demotion in *Baden* that might be cognizable in a stigma-plus claim.

---

[4] Plaintiff's opposition briefing represents, without citation to the record, that she earned $2,000 each year for her service. (Pl.'s Opp'n [Doc. # 26] at 7.) The record, at most, supports an inference that she received a "stipend" of unspecified size.

13

This Court need not resolve whether Chisholm's non-retention is a "demotion" and whether a demotion is sufficient to support a stigma-plus claim. Under *Pearson v. Callahan*, federal courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." 129 S. Ct. 808, 818 (2009). Since the law applicable to determining whether Ramia's non-retention of Chisholm was a "plus" was not clearly established at the time of his actions, Ramia is entitled to qualified immunity. *See Neu*, 869 F.2d at 669–70 (granting defendant qualified immunity on a stigma-plus claim because "[i]t would not be clear to a reasonable government official that the defamation [the plaintiff] has alleged is a deprivation of a protected liberty interest that triggers due process requirements.").

C.   Liability of the Board

Having concluded that summary judgment must enter in favor of Ramia on all counts, the only remaining issue is the liability of the Board. Plaintiff's claim against the Board must fail for three reasons: first, the Board did not take the action of which Plaintif complains;[5] second, because the Board is not a "person" no claim against it may be brought under § 1983, but rather must be brought under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978); and third, even if Plaintiff had asserted a *Monell* claim, that claim would fail.[6]

---

[5] At oral argument Plaintiff agreed that "the Board's liability only derives from whatever its role would have been in the nonappointment." (Oral Arg. Tr. at 7:12–17.)

[6] As a municipal agency the Board may be held liable "if the conduct that caused the [alleged] unconstitutional deprivation was undertaken pursuant to a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . or pursuant to governmental 'custom' even though such a custom has not received

III.     Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment [Doc. # 22] is GRANTED.  The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 1st day of July, 2009.

---

formal approval through the body's official decisionmaking channels." *Jeffes v. Barnes*, 208 F.3d 49, 56 (2d Cir. 2000) (citing *Monell*, 436 U.S. at 690–91).

Plaintiff does not identify any ordinance, regulation, decision, or policy pursuant to which Ramia deprived her of a constitutional right, does not argue that Ramia makes any policy for the Board, and does not provide evidentiary support for a conclusion that the Board has a custom of defaming department administrators when deciding not to retain them.  The only policy apparent from the record is the policy of delegating non-exclusive authority to a department administrator's evaluator to decide whether to retain an administrator in that capacity.  Plaintiff's claim, however, is not that Ramia's *authority* to exercise decisionmaking power is unconstitutional, but rather that the *manner* in which he did so rendered his non-retention of her unconstitutional.  Even if it constituted a constitutional deprivation, Ramia's exercise of discretion under the Board's policy of delegating authority to him does not give rise to municipal liability against the Board.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) ("Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy"); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 n.12 (1986).  And the fact that Ramia's exercise of discretion in deciding not to retain Chisholm was final does not support a conclusion that Ramia had any authority to make policy for the Board.  *Anthony v. City of New York*, 339 F.3d 129, 139–40 (2d Cir. 2003) ("[W]e explicitly rejected the view that mere exercise of discretion was sufficient to establish municipal liability").